UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

KERRI OBEDA ZAKRZEWSKI,
     Plaintiff,

   -against-

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,
     Defendant.

MEMORANDUM AND ORDER
Case No. 2-25-CV-01435 (FB)

*Appearances:*
*For the Plaintiff:*
DANIEL A. OSBORN
Osborn Law, P.C.
43 West 43rd Street, Suite 131
New York, New York 10036

*For the Defendant*:
GEOFFREY M. PETERS
Social Security Administration
Law & Policy
Attn: Program Litigation 2
6401 Security Boulevard
Baltimore MD 21235-6401

BLOCK, Senior District Judge:

Plaintiff Kerri Obeda Zakrzewski ("Obeda") seeks review of the Commissioner of the Social Security Administration's ("the Commissioner" or "Defendant") denial of her application for Social Security Disability Insurance benefits under Title II of the Social Security Act. Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See* ECF No. 7, 11. For the following reasons, Plaintiff's motion is GRANTED, and the Commissioner's motion is DENIED. The case is remanded for further development the record.

Obeda applied for Social Security Disability Insurance benefits on December 7, 2019, alleging disability as of January 11, 2018. ALJ Dec., Tr. at 18.[1] She premised her claim of disability on post-concussion syndrome, depression, anxiety, migraine headaches, memory loss,

---

[1] The Commissioner filed the administrative transcript of the proceedings before the Social Security Administration at ECF No. 5. All references to ECF No. 5 are denoted as "Tr. __."

obsessive compulsive disorder, tendonitis, bipolar disorder, back pain, and attention deficit disorder. Tr. at 495. Although Administrative Law Judge ("ALJ") Andrew S. Weiss initially denied her claim, Obeda appealed, and the Appeals Council vacated the original order and remanded for resolution of various issues, including further analysis of functional limitations caused by Obeda's migraines. *Id*. at 152, 177. On review, ALJ Weiss determined that Obeda had been disabled from January 11, 2018 through July 11, 2019, but was not disabled beginning on July 12, 2019. *Id.* at 36–37. Obeda requested a review by the Appeals Council which was denied. She timely commenced this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act seeking review of the Commissioner's decision. Compl., ECF No. 1.

### Medical Evidence

The record contains voluminous information about Obeda's many physical and psychological ailments, but as this opinion hinges on the ALJ's evaluation of her migraines, the Court summarizes only those medical records that relate to her migraines and associated cognitive issues.

On January 11, 2018, Obeda tripped over a desk at work and struck her forehead. Tr. at 589. She reported severe frontal headache with neck pain, nausea, and vomiting. *Id.* On January 15, she met with Dr. Raymond Ebarb, her primary care provider ("PCP"), and reported that she felt dizzy with quick movements and continued to feel nauseous. *Id.* at 600. She was prescribed Zofran for her nausea, and later that month, Fioricet for her headaches. *Id*. at 603, 628.

On January 19, she met with her personal neurologist Dr. Philippe Vaillancourt at South Shore Neurologic Associates (South Shore). *Id.* at 589. She reported that she had trouble looking at a computer for more than ten minutes and reported an impaired memory, including that she

2

had "found her phone in the freezer." *Id.* Dr. Vaillancourt observed that Obeda was still symptomatic from her head injury and should not return to work. *Id.* at 593.

In February 2018, Obeda met with her psychiatrist Dr. Alan Steinberg for counseling and psychiatric services. *Id*. at 2564–65. She reported headaches, memory issues, and marital stress. *Id.* Dr. Steinberg diagnosed her with bipolar disorder. *Id.* at 2566. She continued to meet with Dr. Steinberg about once every other month through the end of the year. *Id.* at 2567–94.

She showed signs of slow progress throughout 2018. She was prescribed Botox injections to help manage her migraines, which she reported in March were "better" with Botox. *Id.* at 1393. In March, South Shore conducted an advanced cognitive assessment which showed she had below average global cognitive functioning, memory, and attention, and abnormal executive function and information processing abilities. *Id*. at 736. In April she underwent an advanced cognitive assessment which showed below average cognitive performance in memory and executive function. *Id.* at 698–99. In May she was examined by Dr. Jean-Robert Desrouleaux for her workers' compensation claim. *Id.* at 832–841. Based on his examination he determined that she still had a "total (100%) causally related disability from a neurological standpoint." *Id.* at 840.

By September the frequency of her headaches was "down to 3 times per week" and her migraines were "under very good control with Botox." *Id.* at 1456. By December she reported that the headaches were "down to 1-2 times per week" and her migraines were still "under very good control with Botox every three months." *Id.* at 1472.

In 2019, she met with Dr. Vaillancourt every month or two through June. *See* Tr. at 1489–95, 1507–32. In February she was still reporting headaches and memory issues but said she could work on the computer for her husband's business for 45 minutes to two hours per day. *Id*. at

3

1489. In April and June she reported her headaches were "much improved" with Botox and her migraines were "under very good control." *Id*. at 1507, 1527. During these examinations she showed signs of moderately impaired short-term memory. *Id*. at 1493, 1510, 1530. By August 2019, she met with Dr. Vaillancourt again and reported headaches once or twice a week, her migraines were under control, and that she could work on the computer up to two hours at a time and could handle two ideas at one time. *Id.* at 1535.

In March 2020 she met with Dr. Vaillancourt again and showed only moderately impaired short-term memory and a normal level of consciousness. *Id.* at 1586. That same month she was evaluated by nurse practitioner ("NP") Elissa Kravis who diagnosed her with "chronic migraine, without aura, intractable." *Id*. at 1579. She continued Botox injections in April, July, and October, which showed "significant improvement [without] adverse effect." *Id*. at 1589, 1610, 1625.

In August 2020, two State agency medical consultants reviewed Obeda's medical record. While Dr. K. Gallagher found that her migraines and other impairments could prevent her from working, *id.* at 108–09, this opinion was reviewed and overruled by Dr. Roy Brown, who found she could perform a range of medium work and determined that there was no objective medical evidence for a traumatic concussion. *Id*. at 109–11. Dr. Brown particularly rejected Dr. Gallagher's findings because they were "based only on [claimant's] allegations." *Id.* In October 2020, a State agency psychologist reviewed the record but determined that there was insufficient evidence to evaluate Obeda's mental impairments. *Id*. at 120. Dr. Gallagher conducted another review of the record and found that Obeda could perform a range of light work. *Id*. at 121–23.

Obeda continued Botox injections every three months in 2021 and reported significant improvement without adverse effects each time. *Id.* at 1627, 1629, 2823. However, in September

4

2021 she met with Dr. Vaillancourt and reported four or five headaches a month, each lasting one to three days. *Id.* at 2825.

Obeda met with Dr. Steinberg roughly once a month from January to August 2021. During these sessions she continued to demonstrate a highly variable mood, and variable thought processes. *Id.* at 2661, 2672, 2679, 2686. On August 31, Dr. Steinberg summarized his views in a Medical Assessment of Plaintiff's Ability To Do Work Related Activities. *Id.* at 2732-33. Steinberg's concluded that Obeda had a "fair" ability (defined as seriously limited but not precluded) to follow work rules; use judgment; understand, remember, and carry out simple job instructions; and relate predictably in social situations. *Id.* at 2732–33. Furthermore, he determined that she had a "poor" ability (defined as no useful ability to function) to deal with work stresses; maintain attention/concentration; understand, remember, and carry out detailed or complex instructions; behave in an emotionally stable manner; and demonstrate reliability. *Id*. Dr. Steinberg retired shortly thereafter. *Id.* at 2861. Obeda then received her psychiatric prescriptions from her PCP Dr. Ebarb, and the record shows no further psychiatric care until January 2023. *Id*. at 3037. Obeda visited Dr. Ebarb's office throughout 2022 for various medical issues. In August she denied headaches, but during an October visit she confirmed that she was still experiencing them. *Id.* at 2977, 3001.

At her first administrative hearing, in February 2022, the Commissioner appointed impartial medical expert ("ME") Billings Fuess, PhD, testified that Obeda did not meet the criteria of any of the listings. *Id.* at 96–98. He opined that while her memory and executive functioning were "below average," the record nonetheless did not support Dr. Steinberg's opinion. *Id*. He testified that she had moderate limitations in performing complex tasks and mild limitations in performing simple, well-learned, repetitive, routine-type tasks. *Id.* at 97.

In January 2023, Obeda met with Dr. Ebarb, as she was looking for a new psychiatrist. She was anxious, but denied that she had concentration issues, confusion, or behavioral problems. *Id*. at 3038. She returned to Dr. Ebarb in April for an unrelated health issue and once again denied any headaches. *Id*. at 3058. In June 2023, she met with NP Ayshea Beswick for treatment of depression. The appointment notes indicate that she demonstrated logical, goal-oriented, and organized thought process, intact recent and remote memory, an intact fund of knowledge and attention span, and unimpaired judgement. *Id*. at 2858–59. On August 6 she reported that her medications were "effectively managing [her] symptoms," and by October she said she felt "the best she has . . . in years." *Id*. at 2903, 2944.

The ALJ held a second administrative hearing in April 2024. Commissioner-appointed ME Joseph Malanchuaruvil, PhD, testified that Obeda had the following severe impairments: post-concussion syndrome, organic brain syndrome with residual cognitive impairments, and a mood disorder with bipolar features. *Id*. at 54–55. He further testified that Obeda's January 2018 injury left her dealing with "significant" consequences stemming from "frontal brain damage with some compromised executive functioning." *Id*. at 56–57. He explained that brain damage takes time to heal and that "the first six months" after a brain injury are the most important in terms of functioning and healing. *Id*. at 64. Based on this, he observed that her symptoms began to improve "after six months . . . but with significant confusion" and that by mid-2019 she had recovered enough to have a "good mental status exam" (referring to the August 2019 examination by Dr. William Head). *Id*. He opined that Obeda met the requirements for listings 12.02 ("Neurocognitive disorders") and 12.07 ("Somatic symptom and related disorders") for eighteen months after her injury. *Id*. He specifically identified that she satisfied the paragraph B criteria because she had marked limitations in both "understanding, remembering, or applying

6

information," and in "concentrating, persisting, or maintaining pace." *Id*. at 66; *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02(B).

After those eighteen months, however, Dr. Malancharuvil testified that Obeda's condition had improved enough such that she could perform simple work. Tr. at 62. He specifically pointed to treatment records between 2021 and 2023 showing normal psychiatric examinations. *Id.* at *57*, 62-63, referring to Tr. at 1376, 2691, 2738-39, 2752, 2843, 2858. Dr. Malancharuvil refused to testify about Obeda's headaches because they were outside of his expertise. *Id*. at 68–69.

Obeda testified at the same hearing and reported that with Botox she was still getting migraines four to five times a month, lasting from one to three days. *Id.* at 74 (*citing* Tr. at 2823). She further explained that she discontinued the Botox because she couldn't afford the copay one session, because she has a nasal spray that effectively manages her symptoms, and because Botox—consisting of 23 injections into the face—is painful. *Id*. at 76. She said with the nasal spray she would have headaches seven to ten days a month that lasted one to two days. *Id.*

Vocational Expert (VE) Fran Plaisted also testified at the April 2024 hearing. She testified that based on the limitations contained in Obeda's residual functional capacity ("RFC"), there exist a significant number of jobs in the national economy that Obeda could perform, including marking clerk, router, and laundry worker. Tr. at 82–83. She also testified that, based on her experience, if a worker was off task 15% of the workday, or absent from work two or more days a month, there would be no occupations available for her. *Id.* at 84–85.

### Procedural History

District courts reviewing the Commissioner's determinations under 42 U.S.C. § 405(g) must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the

7

correct legal standards have been applied." *Rucker v. Kijakazi*, 48 F.4th 86, 90–91 (2d Cir. 2022). They may not conduct a *de novo* review or substitute their judgment for that of the ALJ, *see Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012), reversing the ALJ "only if the factual findings are not supported by substantial evidence or if the decision is based on legal error," *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013).[2]

The Commissioner employs a five-step inquiry to evaluate Social Security disability claims. *See McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014). The inquiry stops at step three if the claimant is found disabled. When a claimant is found disabled, the ALJ must then determine if the disability continues through the date of the decision. To do so, the ALJ undertakes an eight-step inquiry to determine whether medical improvement has occurred which is related to the claimant's ability to work or whether an exception applies. 20 CFR 404.1594(a). The crux of this second analysis is ascertaining whether changes in the claimant's medical condition render them able to engage in substantial gainful activity.

On remand from the Appeals Council, the ALJ found at steps one and two that Obeda had not engaged in substantial gainful activity since the alleged onset date and has the following severe impairments: post-concussion syndrome, depression, anxiety, obsessive compulsive disorder, attention deficit disorder, migraine headache disorder, and obesity. Tr. at 21. The ALJ also found the following non-severe impairments: lumbar degenerative disk disease, gastroesophageal reflux disorder, hypertension, sleep apnea, and obesity. *Id.* at 22.

---

[2] Throughout this opinion, the Court omits all internal quotation marks, footnotes, and citations, and adopts all alterations, unless otherwise indicated.

8

At step three, the ALJ found that Obeda's symptoms were sufficiently severe that she was disabled between January 11, 2018 and July 11, 2019. Specifically, the ALJ determined that, on January 11, 2018, Obeda fell while at work and hit her head. The injury resulted in debilitating symptoms, including memory loss, neck pain, and migraines (along with the attendant nausea, vomiting, and light-sensitivity). The ALJ determined that for eighteen months after her injury, Obeda satisfied the listings criteria for neurocognitive disorders. 20 CFR Part 404, Subpart P, Appendix 1, § 12.02. She satisfied the "paragraph A" criteria because she had significant cognitive decline in complex attention and executive function, and the "paragraph B" criteria were satisfied because the impairment caused a marked limitation in concentrating, persisting, or maintaining pace and in adapting or managing oneself. Tr. at 23.

The ALJ then turned to the eight-step analysis to determine whether Obeda had experienced any medical improvements that would render her able to engage in substantial gainful activity. Under this second analysis, the ALJ determined that, beginning on July 12, 2019, Obeda has not had an impairment or combination of impairments that meets the requirements of the listings. 20 CFR Part 404, Subpart P, Appendix 1. Specifically, the ALJ noted that Obeda's symptoms had improved to the extent that she no longer satisfied the requirements for neurocognitive disorders, and that she also did not satisfy any of the listings' other categories of disability. The ALJ determined that Obeda had experienced medical improvements and that these improvements resulted in her being able to engage in substantial gainful activity. Tr. at 29.

The ALJ then analyzed Obeda's residual functional capacity ("RFC"), concluding that she could perform light work, with the following limitations: "[Obeda] can never work at unprotected heights or be exposed to moving mechanical parts, bright lights, or loud noise. In addition, [Obeda] can understand, remember, and carry out simple instructions and perform

9

simple routine tasks, use judgment to make simple work-related decisions, and tolerate changes in the work setting." *Id.*

The ALJ then found that Obeda was unable to perform any past relevant work. However, based on the testimony of the vocational expert, the ALJ determined that Obeda would be capable of performing jobs that exist in a significant number in the national economy, namely marking clerk, router, and laundry worker. *Id.* at 36. Accordingly, the ALJ concluded that Obeda was not disabled as of July 12, 2019. *Id.*

Obeda argues that the ALJ erred by (1) making a determination about Obeda's medical improvement not supported by substantial evidence and (2) failing to properly assess Obeda's "symptom intensity," and (3) making an RFC determination not supported by substantial evidence. Pl.'s Mem. at 19–24, ECF No. 7-1. The Court cannot say if the RFC is supported by substantial evidence because the record is insufficiently developed as to Obeda's migraines. The issue is therefore remanded for further development of the record.

### Discussion

"Social Security proceedings are inquisitorial rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 110-11, 120 S. Ct. 2080, 147 L. Ed. 2d 80 (2000). Consequently, "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009. As part of this duty, the ALJ must "investigate the facts and develop the arguments both for and against granting benefits." *Sims*, 530 U.S. at 111. Specifically, under the applicable regulations, the ALJ is required to develop a claimant's complete medical history. *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (citing 20 C.F.R. § 404.1512(d)-(f)).

10

Whether the ALJ has satisfied their duty to develop the record is a threshold question. "Before determining whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), the court must first be satisfied that the ALJ provided plaintiff with a full hearing under the Secretary's regulations and also fully and completely developed the administrative record." *Navedo v. Kijakazi*, 616 F. Supp. 3d 332, 342 (S.D.N.Y. 2022). The ALJ must develop the record even where the claimant has legal counsel. *See, e.g., Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). To satisfy this duty, ALJs may take such further steps as "inter alia, re-contacting the treating physician, requesting additional records, arranging for a consultative examination, or seeking information from others." *Ranaghan v. Comm'r of the Soc. Sec. Admin.*, No. 24-cv-03538 (NCM), 2025 U.S. Dist. LEXIS 163718, at *8 (E.D.N.Y. Aug. 22, 2025). Remand is appropriate where this duty is not discharged. *See, e.g.*, *Moran*, 569 F.3d at 114-15 ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

It's clear that Obeda has experienced significant improvements in the past few years, specifically in terms of her focus and memory. *See, e.g.,* Tr. at 2944 (As of October 2023, "medication is effectively managing symptoms . . . this is the best she has felt in years."); Tr. at 3188 (As of December 2023, "I'm finally feeling not all over the place."). Nonetheless, according to her testimony at the hearing, and her medical records, she continues to get headaches and migraines at least two to three (and as many as seven to ten) times per month. *Id.* at 76. Unfortunately, the ALJ failed to ask any questions about these migraines (e.g. how they manifest, what triggers them, how debilitating they are) and as such the Court therefore cannot determine whether the ALJ's decision is supported by substantial evidence.

11

The only information about headaches the ALJ elicited during the April 2024 hearing was that ME Malancharuvil could not give an opinion about the extent that the migraines "may be affecting her functional abilities." Tr. at 69. As Malancharuvil is a psychologist and not a neurologist he refused to address the physical symptoms of migraines and how they would affect Obeda's ability to work. Consistent with this lack of testimony, the ALJ's decision only analyzed Obeda's headaches insofar as the RFC attempts to manage certain activities that might exacerbate them. *See id.* at 34 (noting that the record supports an RFC "limitation for exposure to bright lights and loud noises based on claimant's testimony that her headaches are triggered by these conditions.")

At no point in the hearing or in the decision does the ALJ directly address Obeda's claims that she has migraines (or headaches) between two and ten times per month that last for a day or two, nor does he analyze whether these headaches are so debilitating that they could affect her ability to work. One problem seems to be a general tendency across the record to elide the difference between headaches and migraines. *See e.g.* Tr. at 29, 30, 32, 34, 72 (ALJ and Obeda's attorney both alternating between use of "migraine" and "headache"). This ambiguity is exacerbated by Obeda's treatment records which simultaneously declare that her symptoms are "manag[ed]" or "under control" with medication, *id.* at 1535, 2903, while also noting that she continues to get "4-5 headache episodes per month, severe in intensity[,] [d]uration 1-3 days." *Id*. at 2825.

Migraines fall into the category of "primary headache disorders" according to SSA regulations. There is no Listed Impairment for migraines, but they may "medically equal a listing" in particular cases. Social Security Ruling (SSR) 19-4p, 2019 SSR LEXIS 6, 2019 WL 4169635, at *7 (Aug. 26, 2019) (titled "Evaluating Cases Involving Primary Headache

12

Disorders"). The Social Security Administration's Ruling 19-4p, 2019 SSR LEXIS 6, instructs ALJs evaluating claimants with migraines that "the most closely analogous listed impairment" to migraines is Listing 11.02 — epilepsy. *Id.*

In assessing whether a migraine disorder meets or equals Listing 11.02, Ruling 19-4p, 2019 SSR LEXIS 6 directs the ALJ to consider a number of factors. These include a "detailed description from an AMS [acceptable medical source] of a typical headache event"; the "associated phenomena" that the claimant experiences (such as "premonitory symptoms" and "aura"); the frequency of headache events; the claimant's adherence to prescribed treatment; any side effects of treatment; and any "limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day." *Id.*

The ALJ did not directly address these factors, and as such the Court cannot determine the severity of Obeda's migraines or how they might functionally affect her ability to work. The Court does not know whether the RFC is sufficiently targeted, or whether the VE's testimony actually supports the finding that there exist jobs that Obeda could perform. If Obeda has migraines multiple times a month that require her to be bedridden for a day or two at a time, then she would—by the VE's own testimony—not be able to find work. Tr. at 84–85. This is precisely the scenario mentioned in her treatment notes from a September 2021 appointment with South Shore. *See id.* at 2825 ("She estimates that if she were at work, she would have to take a break at least 3 or more times per month."). Unfortunately, the Court cannot determine how common or debilitating Obeda's migraines are because the ALJ did not question her about this issue, did not question a medical expert who could speak to the nature of migraines and how they affect one's functional abilities, and did not address the issue in his decision. This is particularly troubling as

13

the Appeals Council already remanded this case once with express instructions that "further consideration of evidence of migraine headaches and any resulting work-related limitations is warranted." Tr. at 177.

Because of the ALJ's failure to question Obeda about her migraines, to seek further information from her physicians or from a medical expert about her migraines, or to directly address the SSR 19-4p factors, the record is insufficiently developed as to this issue. The Court cannot determine whether the ALJ's reasoning is supported by substantial evidence because of this lacuna in the record. *See Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982) (endorsing remand where court is "unable to fathom the ALJ's rationale in relation to evidence in the record."). On remand, the ALJ shall investigate Obeda's migraines so as to better determine whether she has the functional capacity to perform light work, and whether there actually exist jobs in significant numbers the national economy that she could perform. Tr. at 29, 36; *see Berry*, 675 F.2d at 469 (remanding for "further findings or clearer explanation for the decision.").

### Conclusion

The Commissioner's motion is DENIED and Obeda's motion is GRANTED. The case is remanded to the Commissioner to further develop the record as to Obeda's migraines.

**SO ORDERD**

_/S/ Frederic Block_____

FREDERIC BLOCK

Senior United States District Judge

Brooklyn, New York
February 19, 2025